[S. F. No. 14356. In Bank.—March 1, 1932.]

THOMAS HINES, Petitioner, v. THE INDUSTRIAL ACCIDENT COMMISSION OF THE STATE OF CALIFORNIA, A. P. KOETITZ et al., Respondents.

Matthew A. McCullough for Petitioner.

Arthur I. Townsend for Respondent Commission.

Bronson, Bronson & Slaven for Respondent Norwich Union Indemnity Company.

CURTIS, J.—Petition to review an order of the Industrial Accident Commission denying application to increase the permanent disability rating awarded to petitioner from eighty-four and one-fourth per cent disability to total disability and to find that a disability with reference to the genito-urinary organs was proximately caused by the injury.

Petitioner, who was forty-four years of age and foreman of a pile-driving crew, on August 30, 1928, while standing on a staging twelve or fifteen feet high, became overbalanced while reaching for a washer which was being thrown to him by another employee, and fell to the dock below, landing on his left shoulder and elbow and striking with his back a small timber or block which was lying on the dock. His left arm was badly fractured, the ligaments of the chest were torn, there was a compression fracture of the second lumbar vertebra, and an affection of the right kidney. He was taken to the Providence Hospital in Oakland, where he was under the care of Dr. Shade and Dr. Stowe. This medical treatment and hospital care were furnished by Norwich Union Indemnity Company, the insurance carrier of

the petitioner's employee. It was found necessary to operate upon the left elbow and on September 11, 1928, the operation was performed by Dr. Stowe, who removed the head of the left radius and the olecranon process of the ulna of petitioner's left arm. Subsequent to his removal from the Providence Hospital he was treated for a time by Dr. McChesney and Dr. Gilcreest of San Francisco in an effort to give him an increased range of motion in the elbow joint. The effort was not successful, and the applicant apparently became prejudiced against the doctors in charge and refused any further treatment. An application was, therefore, filed with the Industrial Accident Commission by the insurance carrier for an adjustment of petitioner's claim for compensation upon the ground that the injured employee had unreasonably refused an operation which had been offered to him, which operation would have the effect of stiffening the elbow and thereby eliminating the pain occasioned by the use of the elbow. A hearing was held on February 26, 1930, at which hearing Dr. McChesney testified that inasmuch as the patient's arm was useless and any use of it was painful he considered an arthrodesis operation or surgical fixation of the elbow joint by fusion of the joint surfaces advisable. His testimony was to the effect that although any possible motion in the elbow would be destroyed by such operation, the arm would be fixed in a useful position, and although it would not be a movable arm it would be a weight-bearing arm. He further testified that inasmuch as the patient was reluctant to use the arm at all because of the pain in the elbow, if this pain were eliminated by the stiffening of the elbow the condition of the arm as a whole, including the shoulder muscles, would be improved and the efficiency of the patient considerably increased. Dr. Gilcreest corroborated Dr. McChesney's testimony with reference to the advisability of the operation. The sole question raised at this hearing was whether or not the refusal of the petitioner to accept such an operation upon his left elbow was unreasonable, and the other injuries of the employee were discussed only with reference to the advisability of the operation on the elbow. Dr. Gilcreest testified in this regard that the patient was wearing a large brace for his back and the X-rays showed a compression fracture of the second lumbar vertebra and that in his

opinion the rest and care following the operation on the elbow might be beneficial to the back. During the course of this proceeding petitioner stated that following the removal of the plaster jacket which had been applied for the benefit of his back during his former treatment he had contracted a severe cold as a result of such removal and had been confined to his bed for over two weeks. Also during the course of this hearing it was stipulated by the attorney for the insurance carrier that there had been an injury to one of petitioner's kidneys, and petitioner testified that he was bothered in his back in that he suffered from involuntary urination whenever he rode on street-cars, trains or ferry-boats or was subjected to the slightest jar. The findings of fact and award granting temporary disability were made on February 28, 1930, and were in part as follows: ''Thomas Hines . . . sustained injury occurring in the course of and arising out of his employment as follows: When he fell off a staging fracturing his left elbow, left shoulder, torn chest ligaments, and fracture of the second lumbar vertebra, and injury to right kidney. . . . Said injury caused temporary total disability continuing from August 30, 1928, indefinitely, entitling the employee to $20.83 a week during said time, exclusive of the waiting period of seven days. The employee is entitled to an arthrodesis for the purpose of ankylosing the left elbow. A refusal by the employee to accept said arthrodesis shall be considered unreasonable.''

A rehearing was sought by the petitioner and granted by the Commission. At this rehearing, held on May 8, 1930, the issue was again expressly limited by the referee to the question of whether or not the refusal of the employee to submit to the proposed operation was unreasonable. The evidence developed at this hearing in behalf of petitioner was to the effect that by reason of the serious injury to his back he would never be able to carry on his former occupation of bridge building and that, having in mind his physical condition as a whole, the operation for stiffening the elbow was not advisable. It appeared that the petitioner had a morbid fear of an operation and was afraid that he would not survive an anesthesia by reason of a bronchial condition which had developed since his injury and which he attributed to exposure following the removal

of the plaster jacket during the course of his former treatment. It also appeared during the hearing that the petitioner had gained a great deal of improvement in the motion of his arm since the former hearing. There was in fact such a marked improvement that Dr. McChesney testified that he would advise a partial arthro-plastic of the elbow joint to increase the movement rather than an arthrodesis or stiffening of the elbow joint. Dr. Stowe, the doctor who had operated on his arm at the Providence Hospital, testified that the petitioner was in an extremely nervous condition. He was asked whether or not this nervousness affected his kidneys to some extent, to which he replied, "I think it is more of a nervous condition that affects his kidneys, or affects his bladder, because nothing is found on general examination or the urinal examination." During the course of this hearing when Dr. Gilcreest was asked with reference to any injuries other than the elbow and back injury he replied, "He complains of kidney trouble and other sorts of things, which I feel are merely nervous manifestations." At this hearing there was introduced in evidence as exhibits certain X-rays and reports of doctors who had made special examinations of the applicant. One of the reports in evidence was that of Dr. De Puy, who made a urological investigation. Said report is as follows: "The kidneys are neither tender nor palpable, although Mr. Hines complained of pain in the lower right lumbar region. The cystoscope was introduced with great difficulty as a stricture #18 French, was encountered in the posterior urethra and it was necessary to dilate this before proceeding with the examination. The prostate is of normal size and consistency. Bladder examination was negative. Both ureters were catheterized to the kidneys and separated urines collected and a phenosulphonephthalein test of the kidney function was done. The dye appeared in three minutes on both sides. The laboratory report of the separated urines shows them to be essentially negative as to pathology. Plain X-ray pictures and pyelography of the right kidney disclosed no pathology. My conclusion, therefore, is that with the exception of a stricture of the posterior urethra, all other urological findings are negative." This report was dated March 16, 1929, which, it will be noted, was almost a year prior to the date of the first hearing

at which it had been stipulated that there had been an injury to the right kidney. There was also in evidence a report, dated May 6, 1930, of Dr. Cary and Dr. Barnard, which, after setting forth exhaustively the results of the physical examination given petitioner, concludes with the statement that "From the history, physical and X-ray examination we are of the opinion . . . that there are certain genito-urinary disturbances, the relation of which to the injury we are not in a position to value." Subsequent to said hearing on July 10, 1930, findings and an award were made which found that the refusal of the applicant to submit to a surgical operation to ankylose the left elbow, in view of all the circumstances, was not unreasonable. The findings, however, relative to the injuries of the employee made no mention of the injury to the kidneys, the finding in this respect being as follows: "Thomas Hines . . . sustained injury occurring in the course of and arising out of his employment, when he fell from a staging sustaining fracture of his left elbow; fracture of the second lumbar vertebra; and injuries to his left side and shoulder, and tearing of ligaments of the chest."

On July 11, 1930, the insurance carrier made application to the Commission that a permanent disability rating on petitioner's disability be made, alleging that the condition of the employee had reached a permanent state, and that no further improvement could be anticipated without operative procedure. In the report of Dr. Gilcreest to the Commission he set forth as a description of the injury "old compression fracture of second lumbar vertebra. Severe old injury of left elbow resulting in great limitation of movements. Injury to left wrist." The petitioner also filed an application which was accompanied by a report of Dr. Stowe showing in detail the result of a recent physical examination of petitioner by him. In this latter report under "findings" is the following statement: "Pain and limited motion in spine, pain in right kidney region resulting polyuria on the slightest jar to the back such as riding in an automobile or street car." No hearing was had but an order fixing the permanent disability rating was filed on August 20, 1930. This order set aside and rescinded the findings and award of February 28, 1930, and the decision on rehearing of July 10, 1930, but included as a description

of the injury sustained the identical language of the finding of July 10, 1930, omitting from said finding any mention of a kidney injury or any disability arising from the fact that the applicant had lost control of the urinary function of the bladder. In the award the applicant was given a rating of eighty-four and one-fourth per cent disability based upon the condition of his left arm and back, entitling him to $20.83 a week for 240 weeks, and the sum of $7.77 weekly thereafter for the remainder of his life. A rehearing was sought by applicant of this permanent total disability rating upon the ground that the rating was based only upon the injury to his left arm and back and that the bronchial condition which he alleged resulted from the treatment given him after the accident and the disability resulting from injury to the genito-urinary organs were not taken into consideration. This application for a rehearing was dismissed by the Commission on September 29, 1930. No petition for a writ of review to this court was sought and the time for seeking such review expired on October 29, 1930. Thereafter on December 8, 1930, the applicant filed a petition for total permanent disability rating on the ground of new and further disability. In this petition, the applicant alleged that since the date of the order of August 20, 1930, he had incurred a new and further disability arising out of the original injury of August 30, 1928, which new and further disability consisted of a permanent injury to his lungs and a permanent loss of control of the urinary function of the bladder and cut-off muscle of the urethra. The petition was granted and a hearing held. At this hearing Dr. Stowe testified that the petitioner had developed a typical bronchial asthma which would necessitate a change of residence in order to get relief. With reference to the involuntary urination condition, Dr. Stowe testified that in his opinion it was due to the accident, "the result of the accident that has interfered with the function of the kidneys and with the muscles that control the urethra". In reply to a question as to what way the injury was connected with the condition he replied, "Evidently through his nervous system. There is a central nervous system and that would cut off the fourth [afterwards corrected to second] lumbar vertebra where you have a fracture through trauma or injury to those nerves." In

response to a question as to whether the nerves in that region affect the kidney in their function, he explained that they controlled the functioning of the bladder. Dr. Kroll testified with reference to the lung condition of the petitioner that in his opinion the petitioner did not have asthma and that a change of residence was not necessary. Dr. McChesney was also called and testified, but his testimony was limited to the nature of the treatment furnished by him in the first instance with reference to the removal of the plaster jacket. This concluded the evidence. At this hearing, therefore, the only testimony with reference to the genito-urinary condition was the testimony of Dr. Stowe. The Commission, thereafter, on March 31, 1931, denied the petition for an increase in permanent disability rating, and made the following findings of facts: "The evidence does not establish that the injury suffered by the employee August 30, 1928, caused internal injuries which have resulted in disability, or that the disability with relation to the genito-urinary organs, the chest or the bronchial tubes of which the employee complains, was proximately caused by said injury."

In the presentation of the above statement of facts the evidence relative to the disability with reference to the genito-urinary organs has perhaps been unduly stressed. It forms but a small portion of the evidence adduced at the various hearings before the Commission for, as before noted, at the first two hearings the question was limited to the advisability of an arthrodesis of petitioner's left elbow and at the last hearing the issue of whether or not the petitioner had suffered any permanent disability of the chest or bronchial tubes was the only issue emphasized, the testimony of both Dr. Kroll and Dr. McChesney being directed entirely to this question. Petitioner does not complain that the recognized disabilities were not sufficiently rated. He also concedes that, as there was a conflict in the testimony before the Commission relative to the disability of the chest or bronchial tubes, he is in no position to complain of the finding relative thereto. Petitioner does complain, however, that there is no true conflict in the evidence relative to the genito-urinary condition, and insists that the finding of the Commission relative thereto is erroneous. Petitioner points out that this disability, which at first

seemed of minor importance, has become of paramount importance since it debars him from any remunerative employment, and insists that it entitles him to a total permanent disability rating.

If petitioner's contention is correct, it follows, of course, that the award of the Commission based upon findings which failed to take into consideration this further disability is erroneous and should be annulled.

There is no dispute, apparently, that petitioner's condition is as stated by him and that such condition is serious since it results in his constant embarrassment and in effect social ostracism. At least we find no contradiction of it in the record. Likewise there is no dispute, apparently, that petitioner suffered from no such disability previous to the injury. No attempt was made to show that such condition was not of recent origin, and petitioner's testimony to the effect that one of the effects of the injury to his back was this disability was not contradicted in any way.

There is a strong preponderance of evidence in the record to the effect that petitioner did, in fact, suffer a kidney injury at the time of the accident. Dr. Stowe, who attended petitioner when he was first injured, was positive in his affirmation of his recollection that there had been symptoms indicating such an injury. In a letter sent by Dr. Shade, who was in charge of petitioner's case at the time, asking Dr. De Puy to make a urological examination, he says, ''at the time of the injury he (petitioner) had a hematuria (a discharge of bloody urine) for a few days and also suffered anuria (failure of kidneys to secrete urine).'' There is also some evidence that Dr. Shade had proposed an operation for the removal of the right kidney, but did not operate because of the opposition of petitioner's wife. There is also the stipulation of the attorney for the insurance carrier at the first hearing that there had been a kidney injury. In opposition to this evidence is only the fact that the hospital records of petitioner's case immediately after the accident were silent as to an injury to the kidney, and that some six months afterward the report of Dr. De Puy, who made a urological examination, indicated that at that time the right kidney disclosed no pathology. In the face of the fact that both doctors in charge of petitioner had definitely stated that there were symptoms

which indicated a kidney injury, the failure in the hospital reports to note these symptoms is of slight probative value. Also the negative report of Dr. De Puy, dated some six months after the accident, is not conclusive that no such injury had in fact occurred. The utmost effect which can be given to Dr. De Puy's report—and this, of course, must not be minimized—is that six months after the injury there was no indication of any pathology or defect of the kidney. At most this report indicates that at that date some six months subsequent to the accident there were no indications that the kidney was not functioning properly. However, we must concede that the report of Dr. De Puy is sufficient to support a conclusion that any ill effects of a possible injury to the kidney itself had, at the date of his report, disappeared, and that, therefore, the Commission, basing its conclusion upon this report, was justified in ruling out the kidney injury as the cause of petitioner's condition.

It is to be noted, however, that the explanation of Dr. Stowe as to the cause of the condition does not concern itself with the injury to the kidney itself. According to his testimony the serious injury to petitioner's back is the cause of the condition complained of by petitioner. He, by positive testimony, attributed petitioner's condition to be a result of the injury to the spine involving the nerve centers which send nerves of control to the bladder and urethra.

There is nothing in Dr. De Puy's report which is contradictive of this explanation. This report has been hereinbefore set out and there is nothing therein to indicate that the report was based on an examination designed to reveal an injury to the nerves controlling the urinary function. It is entitled to weight only upon those matters with which it purports to deal and necessarily is no evidence upon those matters upon which it is silent. Moreover, this report, dated March 16, 1929, would scarcely seem to be in conflict with evidence as to petitioner's condition, upon a hearing as to a new and further disability some two years later, since the disability, although it may not have been manifest at the date of the report, may have subsequently developed. The other medical evidence in the record upon the question here involved is of little, if any,

value. The testimony of Dr. Gilcreest, as before stated, that the petitioner "complains of kidney trouble and other sorts of things which I feel are merely nervous manifestations," is susceptible of two constructions, either of which, however, is favorable to petitioner. If Dr. Gilcreest intended to imply that the condition was due to an injury to the nerves, it is corroborative of Dr. Stowe's testimony. If he intended simply to imply that it was caused by excessive nervousness on the part of the petitioner, the disability is equally assignable to the injury, since petitioner's nervous condition is attributable to the accident and the pain suffered during the subsequent treatment of his injuries. Respondent relies to some extent upon the fact that Dr. Gilcreest in his report to the Commission set out only the injury to the left arm and spine. In the absence of anything to indicate that he purposely omitted reference to any other condition or disability, this omission cannot be dignified, in our opinion, as evidence of any appreciable weight.

We have read with care all of the testimony adduced and the medical reports set out in the record and we are unable to find any evidence of probative value contradictive of Dr. Stowe's testimony. It follows, therefore, that the testimony of Dr. Stowe to the effect that petitioner's condition is the result of the spinal injury, standing uncontradicted, and as a matter of fact not even assailed by other competent medical testimony, is determinative of the question here involved. This was a matter particularly within the knowledge of experts, and this being so, the expert evidence is conclusive upon the point in issue. In *William Simpson C. Co.* v. *Industrial Acc. Com.*, 74 Cal. App. 239, 243 [240 Pac. 58, 59], the following rule was enunciated: "Whenever the subject under consideration is one within the knowledge of experts only, and is not within the common knowledge of laymen, the expert evidence is conclusive upon the question in issue. It follows that in such cases neither the court nor the jury can disregard such evidence of experts, but, on the other hand, they are bound by such evidence, even if it is contradicted by nonexpert witnesses. The same rule would, of course, apply to a proceeding before the Industrial Accident Commission. Under this rule the Commission could not . . . reject the evidence

of medical experts when testifying upon any subject peculiarly within their own knowledge. The same rule would apply as to opinions of the medical experts upon a subject solely within their professional knowledge, and not within the knowledge of the ordinary individual.'' (See, also, *General Accident F. & L. Assur. Corp.* v. *Industrial Acc. Com.*, 106 Cal. App. 39 [288 Pac. 692]; *Johnson* v. *Clarke*, 98 Cal. App. 358, 364 [276 Pac. 1052]; *Newton* v. *Industrial Acc. Com.*, 204 Cal. 185, 189 [60 A. L. R. 1279, 267 Pac. 542].)

As before pointed out, at the hearing on the question of a new and further disability no effort was made to introduce in evidence upon this particular phase of the case any medical testimony other than that of Dr. Stowe. The testimony of Dr. McChesney and Dr. Gilcreest at the first and second hearing with reference to the elbow injury seems to indicate that they were of the opinion that the petitioner was exaggerating his condition, or at least that he was not giving them complete co-operation in their endeavor to minimize the effects of his injury, and it may have been that this fact to some extent unconsciously influenced the Commission. It is also possible that medical evidence might perhaps have been introduced at the hearing to show that petitioner's condition was due to some cause other than that testified to by Dr. Stowe. It will suffice to say, however, that no such evidence was in fact offered.

It is our opinion, therefore, that that portion of the finding of the Commission that ''the evidence does not establish that . . . the disability with relation 1 ) the genitourinary organs was proximately caused by said injury'' is erroneous for the reason that the uncontradicted medical evidence in the record establishes the fact that the loss of control of the urinary function is a result of the injury to the spine, which injury, it is conceded, was proximately caused by the accident. As this disability was not included in the permanent disability rating, the award to that extent is not sufficient. The determination of the percentage of this disability is, of course, left to the sound discretion of the Commission to be exercised in view of all the circumstances. (27 Cal. Jur., p. 506; *Frankfort Gen. Ins. Co.* v. *Pillsbury*, 173 Cal. 56 [159 Pac. 150]; *Ford Motor Co.* v. *Industrial Acc. Com.*, 202 Cal. 459 [261 Pac. 466].)

█ Petitioner complains of the finding that the evidence does not establish that the injury suffered by the employee caused "internal injuries" which have resulted in disability, insisting that the injury to the spine not being external was necessarily internal, and that this finding, in view of the previous finding that petitioner suffered a fracture of the second lumbar vertebra, is clearly erroneous. He is apprehensive that if death should occur as a result of the admitted injuries that this finding would be binding and would preclude an award for a death benefit based upon such injuries. Certainly the term "internal injuries" is not a term of precision. The attorney for the Commission defines this term to mean "injuries to organs in the abdominal cavity such as stomach, liver, spleen, kidneys, intestines, etc". For the purpose of this and any subsequent proceeding in this matter we adopt this definition. As so defined, in view of the fact that we have hereinbefore found the Commission's conclusion with reference to a disability resulting from a kidney injury to be supported by the evidence, the finding is not erroneous, and as so defined the term would not include an injury to the spine nor to the nerves affected by such spinal injury.

█ Respondent presents a procedural difficulty to a review of the petition for total permanent disability rating predicated upon a new and further disability. Respondent claims that the disability here asserted by petitioner is not a new and further disability for the reason that petitioner has been making a claim for such disability "almost from the beginning." It asserts that the petition for a rehearing of the award for a permanent disability rating having been denied by the Commission and no application for a review by this court having been sought by petitioner, his remedies are exhausted and he is foreclosed from "reopening" the matter in a later proceeding. It is true that there was some evidence adduced at the first two hearings before the Commission bearing in a slight degree upon the disability under discussion. But, as before pointed out, it was entirely incidental to the question of whether or not an arthrodesis of the left elbow was advisable, and this was the only question involved at said hearing. The record shows that it was not until the filing of the petition for a rehearing of the permanent disability rating that the atten-

tion of the Commission was fairly and squarely called to the fact that petitioner was claiming an additional rating by reason of his particular disability. As this petition was dismissed upon the ground that the Commission had "no jurisdiction over a second petition for a rehearing", it is evident that petitioner's case was not then considered on its merits.

It is well settled that, even though compensation for temporary disability has been allowed for an injury, the Commission, if said injury becomes a permanent disability, may grant compensation upon the ground of a new and further disability. (*Cowell L. & C. Co.* v. *Industrial Acc. Com.*, 211 Cal. 154, 160 [72 A. L. R. 1118, 294 Pac. 703, 705], and cases there cited.) In that case the court said, "Many times the seriousness of the injury is not at first apparent, and from its nature cannot be detected until considerable time has elapsed after its infliction. The clear intent of the statute in such cases is that the injured employee shall be entitled to compensation for his permanent disability notwithstanding the fact that he may in the early stages of his injury have been granted an award only for temporary disability, or may have been paid compensation voluntarily by his employer; provided, of course, that proceedings for the collection of such permanent disability shall have been commenced within 245 weeks after the date of the original injury." In the instant case the disability which at the outset was of minor importance has apparently developed into a serious condition. This being so, the Commission was well within its jurisdiction in granting a hearing upon said matter.

The order of March 31, 1931, denying petition for increase of permanent disability rating is annulled, and the cause is remanded to respondent Commission for such further proceedings as may be appropriate in accordance with this decision.

Shenk, J., Preston, J., Langdon, J., Seawell, J., and Waste, C. J., concurred.